UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVID L. MARTIN,                           )  Case No. 1:17CV2554
                                           )
            Plaintiff,                     )
                                           )  JUDGE CHRISTOPHER BOYKO
      v.                                   )  MAGISTRATE JUDGE DAVID A. RUIZ
                                           )
COMMISSIONER OF SOCIAL                     )
      SECURITY,                            )
                                           )
            Defendant.                     )  REPORT AND RECOMMENDATION


Plaintiff David Lawrence Martin ("Martin" or "claimant") challenges the final decision of Defendant Commissioner of Social Security ("Commissioner"), denying his applications for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be affirmed.

## I.  PROCEDURAL HISTORY

On February 25, 2015, Martin filed applications for a period of disability and DIB, and for SSI benefits, both applications alleging disability beginning July 5, 2010.  (R. 9, Transcript ("tr."), at 259-262, 267-270, 310-312, 313-319.)  Martin's applications were denied initially and upon reconsideration.  (R. 9, tr., at 110-129, 130-149, 150-151, 152-166, 167-181, 182-183.)

Thereafter, Martin filed a request for a hearing before an administrative law judge ("ALJ").  (R. 9, tr., at 218-219.)

The ALJ held the hearing on December 5, 2016.  (R. 9, tr., at 38-84.)  Martin appeared at the hearing, was represented by counsel, and testified.  (*Id.* at 40, 41-75.)  A vocational expert ("VE") attended the hearing and provided testimony.  (*Id.* at 40, 76-83.)  On January 12, 2017, the ALJ issued her decision, applying the standard five-step sequential analysis, and determined that Martin was not disabled.  (R. 9, tr., at 17-30; *see generally* 20 C.F.R. §§ 404.1520(a) and 416.920(a).)  The Appeals Council denied Martin's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (R. 9, tr., at 1-3.)  Martin seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  The parties have completed briefing in this case.  Martin presents two legal issues for the court's review that challenge the ALJ's RFC finding and assessment of Listing 1.04. (R. 10, PageID #: 655.)

## II.  PERSONAL BACKGROUND INFORMATION

Martin was born in 1974 and was 35 years old on the alleged disability onset date.  (R. 9, tr., at 41, 267.)  Accordingly, Martin was considered a younger individual age 18-44 for Social Security purposes.  *See* 20 C.F.R. §§ 404.1563, 416.963.  Martin has at least a high school education and can communicate in English.  (R. 9, tr., at 42, 313, 315.)  Martin had past work as a packager/inspector, molding machine operator, and grinding machine operator.  (R. 9, tr., at 76.)

### III.  RELEVANT MEDICAL EVIDENCE[1]

Disputed issues will be discussed as they arise in Martin's brief alleging error by the ALJ. As stated above, Martin filed applications for a period of disability and DIB, and an application for SSI benefits on February 25, 2015.  (R. 9, tr., at 259-262, 267-270.)  In his application, Martin listed his physical or mental conditions that limit his ability to work as: "depression, anxiety, bi-polar, nervous, emotional."  *Id.* at 314.

At the request of the state agency, Martin was referred to Richard Halas, M.A., for a psychological evaluation to determine his functioning level.  (R. 9, tr., at 361-366.)  After a clinical interview and a mental status examination, Mr. Halas prepared a Psychological Report on June 22, 2012.  *Id.*  Martin reported to Mr. Halas that his chief complaint was significant problems with anxiety, that he had "shortness of breath and this is what keeps him from working competitively at this time."  *Id.* at 361.  The claimant reported an extensive history of substance abuse, including heroin (in 2002), marijuana, and alcohol.  *Id.* at 362.  He stated he had not used marijuana or alcohol in the past year.  *Id.*

Mr. Halas noted that Martin's "most unusual or concerning behavior [at the interview] was a flat, hesitant and tentative presentation," and his speech was slow and constricted.  (R. 9, tr., at 363.)  He was neither impulsive nor compulsive, and he did not have any problems with fragmented thoughts or flights of ideas.  *Id.*  Martin reported that he had significant sleep

---

[1]  The summary of relevant medical evidence is not intended to be exhaustive.  It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

difficulties and was often up during the night. *Id.* He also reported crying spells, and Mr. Halas observed that he was tearful at times during the interview. *Id.* Martin had a flat affect, depressed mood, and feelings of hopelessness, helplessness, and worthlessness. *Id.*

Mr. Halas stated that Martin had relatively high levels of anxiety. (R. 9, tr., at 363.) The psychologist did not observe any specific symptoms or characteristics that would be consistent with a thought disorder or psychosis; he was neither hallucinatory nor delusional. *Id.* at 364. The claimant's daily activities were described as fairly normal, although he reported having few friends. *Id.* Mr. Halas concluded that Martin has a history of anxiety and panic attacks, did not have cognitive deficits, and is able to follow through with instructions and directions. *Id.* at 365.

Mr. Halas classified Martin with Polysubstance Abuse (in remission); Major Depression, recurrent; and, Generalized Anxiety Disorder. (R. 9, tr., at 365.) On Axis II, he has Antisocial Personality Disorder. *Id.* Mr. Halas' functional assessment of Martin was that he had no limitations in understanding, remembering and carrying out instructions; and no limitations in maintaining attention and concentration, or maintaining persistence and pace to perform tasks. *Id.* at 365-366. However, Mr. Halas assessed that Martin had significant problems in responding appropriately to supervision and to coworkers, and in responding appropriately to work pressures. *Id.* at 366. His depression and anxiety are likely to restrict his ability to be effective and appropriate in his relationships to others, and his anxiety is likely to increase under the pressures of a normal work setting. *Id.*

Psychologist J. Joseph Konieczny, Ph.D., prepared a more recent psychological evaluation of Martin on May 1, 2015. (R. 9, tr., at 475-478.) Dr. Konieczny's evaluation was based on a clinical interview, school records, and a review of Mr. Halas' earlier evaluation. *Id.*

4

at 475.  During the clinical interview, Martin described his current disability as "anxiety and depression."  *Id.*  His reason for not working since his last job was that he did not like being in crowds.  *Id.* at 476.  Martin had been involved in outpatient counseling from 2003 to 2005; and he has been treated for anxiety and depression.  *Id.*  Martin reported episodes of crying, about twice a week.  *Id.*  Dr. Konieczny observed no indications of nervousness, anxiety, delusional or paranoid thinking during the interview, and reported that claimant's general thought content did not appear to be unusual.  *Id.*  Martin denied any history of auditory or visual hallucinations.  *Id.*

Martin reported a history of criminal behavior, including incarceration on at least five occasions.  (R. 9, tr., at 476.)  He also reported a history of heroin use, and repeated inpatient drug treatment, although no recent reported drug problems.  *Id.*  Martin reported continuing sleep difficulties, that he is unable to fall asleep easily, and is unable to sleep through the night.  *Id.* at 476-477.  The psychologist found that Martin's ability to concentrate and to attend to tasks showed no indications of impairment.  *Id.* at 477.  His activities of daily living consist mostly of watching television; and although he knows how to cook, clean, and do the laundry, his mother performs these tasks for him, as "I just don't feel like doing anything."  *Id.*

Dr. Konieczny diagnosed Martin with Other Specified Depressive Disorder, Depressive Episodes with Insufficient Symptoms, and Other Specific Personality Disorder.  (R. 9, tr., at 477, 478.)  Dr. Konieczny's functional assessment of Martin is that he has no significant limitations in understanding, remembering and carrying out instructions; and no limitations in maintaining attention and concentration to perform tasks.  *Id.* at 477.  He found that Martin has "diminished tolerance" for frustration and diminished coping skills for responding appropriately to supervision and interpersonal situations in a work setting, and "diminished tolerance" for

5

frustration and diminished coping skills in responding appropriately to typical work pressure.  *Id.* at 477-478.  Dr. Konieczny stated, however, that it should be noted "some of these limitations are volitional," and are reflective of his mood symptoms.  *Id.* at 478.  The psychologist summarized that claimant's "overall level of functioning is at a reduced level of efficiency and reflective of his mood symptoms and personality disorder."  *Id.*

State agency reviewing psychologist, Karla Voyten, Ph.D., found on July 10, 2015, that Martin had a mild restriction of activities of daily living; and moderate difficulties in maintaining social functioning, or maintaining concentration, persistence or pace.  (R. 9, tr., at 122 (psychiatric review technique).)  Dr. Voyten completed a mental residual functional capacity assessment, in which she found that Martin was moderately limited in his ability to carry out instructions, in his ability to maintain attention and concentration for extended periods, and in his ability to work in coordination with, or in proximity to, others without being distracted by them.  *Id.* at 125-126.  Dr. Voyten assessed that claimant's ability to interact appropriately with the public was markedly limited; and his abilities to accept instructions and respond appropriately to criticism from supervisors was moderately limited, as was his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  *Id.* at 126.  Dr. Voyten also indicated that Martin was moderately limited in his ability to respond appropriately to changes in the work setting.  *Id.* at 127.  She noted that some of his psychological symptoms were exacerbated by noncompliance with his medications, and that a worsening of his depression in March 2015 was situational.  *Id.*

On reconsideration, state agency reviewing psychologist, Carl Tishler, Ph.D., adopted Dr. Voyten's psychiatric review technique findings (mild restriction of activities of daily living; and

6

moderate difficulties in maintaining social functioning, or maintaining concentration, persistence or pace).  (R. 9, tr., at 159.)  Dr. Tishler's mental RFC assessment was also identical with Dr. Voyten's assessment.  *Id.* at 162-164.

On January 5, 2016, Martin presented at Signature Health, on referral from his primary care physician, for a mental health diagnostic assessment.  (R. 9, tr., at 594-596.)  Martin reported that his physician would not continue his current medications, and he was "only at [Signature Health] for depression and anxiety medication."  *Id.* at 594.  He had been scheduled for a CD (chemical dependency) assessment as well, but stated he was only interested in the psychiatric medications.  *Id.*  Martin reported that he had used heroin intravenously for about ten years and stopped the previous year with the help of Vivitrol.[2]  *Id.* at 595.  Martin stated that, although he had been off heroin for over a year, he "would like the Vivitrol injection without any treatment," but was informed that "treatment is part of the Vivitrol" at Signature Health.  *Id.* at 596.  Therapist Jane Lewis determined that he met the criteria for Post-Traumatic Stress Disorder ("PTSD"); Opioid Dependence, full remission; Anxiety NOS; and Depressive Disorder NOS. *Id.*

Martin presented to Hiu Kwan Yip, PMHNP-BC ("Psychiatric Mental Health Nurse Practitioner- Board Certified") at Signature Health on February 8, 2016, for a psychiatric evaluation.  (R. 9, tr., at 529-535.)  During the mental status exam, Nurse Yip found that Martin was "oriented x4," restless, depressed, and anxious. *Id.* at 534.  His thought process was linear

---

[2]  At the June 2012 evaluation with Halas, Martin reported he had "in the past used heroin in 2002."  (R. 9, tr., at 362.)

and organized, and no hallucinations or delusions were observed or reported.  *Id.*  His memory

was intact, and his attention, concentration, judgment and insight were fair. *Id.*  Nurse Yip's

initial impressions were Unspecified Bipolar Disorder, Posttraumatic Stress Disorder, and

Unspecified Anxiety Disorder.  *Id.* Her treatment plan was medication:  to prescribe Abilify, to

continue Wellbutrin and Clonazepam, and to schedule a follow-up appointment.  *Id.* at 535.

On October 3, 2016, Nurse Yip completed a Mental Medical Source Statement.  (R 9, tr.,

at 587-592.)  Nurse Yip assessed Martin with bi-polar disorder, and PTSD.  *Id.* at 587.  She also

noted he had hypertension, scoliosis, and gastroesophageal reflux disease ("GERD").  *Id.*  At the

time she completed her statement, Martin was on several medications, and was "soon to start

counseling." *Id.*  Nurse Yip's clinical findings after a mental status examination were mood

instability, sleep disturbance with frequent nightmares, and persistent anxiety with panic attacks,

particularly in social situations.  *Id.*  Martin's prognosis was fair, with treatment and compliance.

*Id.* She did not indicate that he suffered from paranoid thinking, hallucinations or delusions.  *Id.*

at 588.

Nurse Yip assessed Martin's abilities to do work-related activities on a day-to-day basis

as "unable to meet competitive standards" for unskilled work in the categories of working in

coordination with, or in proximity to, others without being unduly distracted; and, getting along

with coworkers or peers without unduly distracting them or exhibiting behavioral extremes.  (R

9, tr., at 589.)  She assessed him as "seriously limited" in his ability to remember work-like

procedures, to maintain attention for a two-hour segment, to perform at a consistent pace without

an unreasonable number and length of rest periods, to respond appropriately to changes in a

routine work setting, and to deal with normal work stress.  *Id.*

8

Further, Nurse Yip assessed Martin's abilities to do work-related activities as "unable to meet competitive standards" for semi-skilled and skilled work in the categories of understanding, remembering, and carrying out detailed instructions, and in dealing with the stress of such work. (R 9, tr., at 590.)  The nurse indicated that Martin had no useful ability to interact appropriately with the public, or to travel to unfamiliar places.  *Id.*  He was "unable to meet competitive standards" in his ability to maintain socially appropriate behavior, or to use public transportation. *Id.*  She indicated that Martin did not have a low IQ or reduced intellectual functioning.  *Id.*  The nurse indicated that Martin would find numerous ordinary demands of work, such as speed, precision, complexity, deadlines, completing tasks, and working with other people, to be stressful.   (R 9, tr., at 591.)  Nurse Yip anticipated that Martin would, on average, miss more than four workdays per month because of his impairments or treatment; and she noted that Martin was not currently abusing alcohol or other drugs.  *Id.* at 591-592.

State agency reviewing physician Michael Delphia, M.D., prepared a physical RFC assessment on July 2, 2015.  (R. 9, tr., at 124-125.) Dr. Delphia determined Martin was capable of light work, with the ability to stand or walk about six hours, and the ability to sit for six hours, of an eight-hour workday.  *Id.* at 124.  These exertional limitations were due to claimant's lumbar and cervical degenerative disc disease.  *Id.*  Dr. Delphia opined that Martin can never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, stoop, crouch, or crawl; and can frequently balance or kneel.  *Id.*  On reconsideration on October 14, 2015, state agency reviewing physician Elaine Lewis, M.D., concurred with Dr. Delphia's physical RFC. *Id.* at 160-162.

9

### IV.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in the January 12,

2017, decision:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2.  The claimant has not engaged in substantial gainful activity since July 5, 2010, the alleged onset date (20 C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  idiopathic scoliosis, prominent levoscoliosis, degenerative changes of the lumbar and cervical spine with lumbar stenosis, generalized anxiety disorder, major depressive disorder, compulsive disorder, antisocial personality disorder, and obsessive/compulsive disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, the undersigned  finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds, he can occasionally stoop, crouch, and crawl, and he never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle.  He can frequently balance and kneel.  He can understand, remember, and carry out simple, routine tasks, he can occasionally interact with supervisors and he can have superficial interaction with the public and coworkers without involving the claimant dealing with [sic] directly with demands or problems of coworkers or the public.

6.  The claimant is capable of performing past relevant work as a package inspector.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from July 5, 2010, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(R. 9, tr., at 19, 20, 24, 28, 30.)

10

### V.  DISABILITY STANDARD

A claimant is entitled to receive DIB or SSI benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  20 C.F.R. §§ 404.1505(a), 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a disability determination.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  *Id.* § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  *Id.* § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  *Id.* § 404.1520(a)(4)(v).
>
> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

### VI. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971)*.* "Substantial evidence" has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

## VII.  ANALYSIS

### A.  Whether RFC was Supported by Substantial Evidence

The first issue raised by Martin is whether the ALJ's RFC finding is supported by substantial evidence.  (R. 10, PageID #: 655.)  Martin contends "the ALJ ignored and mischaracterized evidence favorable to Plaintiff relating to his severe mental impairments and improperly weighed and evaluated the opinion evidence of record."  *Id.*  The claimant provides a wide-ranging argument in support of this contention, touching on several different issues.  *Id.* at 665-672.

The ALJ has the responsibility for reviewing all the evidence in making his or her determinations.  20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).  The ALJ evaluates every medical opinion received in evidence (20 C.F.R. §§ 404.1527(c), 416.927(c)); and considers any statements that have been provided by medical sources, whether or not based on formal medical examinations.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  Although the ALJ reviews and considers all the evidence before her, the responsibility for assessing the claimant's residual functional capacity rests with the ALJ.  20 C.F.R. §§ 404.1546(c), 416.946(c).

Martin's focus is primarily on two portions of the ALJ's decision in support of the RFC. The ALJ had found that claimant had the severe mental impairments of "generalized anxiety disorder, major depressive disorder, compulsive disorder, antisocial personality disorder, and obsessive/compulsive disorder."  (R. 9, tr., at 24.)  In discussing Martin's alleged symptoms related to his mental impairments, the ALJ found that his statements regarding their severity "were partially consistent with the evidence."  *Id.* at 26.  The ALJ recounted that Martin testified:

> . . . he has problems remembering appointments, is fidgety and nervous, experiences paranoia, is usually tired with occasional bursts of energy, high and

> low moods, and both auditory and visual hallucinations due to his mental
> impairments. Again, while there is ample evidence that the claimant has sought
> mental health treatment throughout the adjudicated period, there is no evidence
> that he experienced mood swings and he consistently denied hallucinations.

(R. 9, tr., at 26, citing medical evidence of record.)

The other instance cited by Martin concerns the ALJ's discussion of opinion evidence, wherein the ALJ gives great weight to the opinions of the consulting psychologists. (R. 9, tr., at 27.) The ALJ stated that their findings "were also consistent with the claimant's treatment notes showing intermittent problems with anxiety and social isolation." *Id.* (citing medical evidence of record).

Turning first to the ALJ's evaluation of his testimony, Martin contends that the ALJ mischaracterized the record in identifying purported inconsistencies in his allegations, "such as incorrectly stating the record contained no evidence of treatment for mood swings or hallucinations; and finding that Plaintiff had only 'some' depressive symptoms." (R. 10, PageID #: 665.) Martin argues that the record in fact "shows quite the opposite." *Id.* at 665-666. In part, the claimant argues that the ALJ did not evaluate the record as a whole, because the ALJ cited records from an allegedly incomplete time span in support of certain statements. *Id.* From this, he concludes that the ALJ must have failed to evaluate treatment records after January 2016, records which he argues would support Nurse Yip's evaluation. *Id.* at 666.

It is well settled that an ALJ is not required to discuss every piece of evidence in the record to support the decision. *Moscorelli v. Colvin*, No. 1:15CV1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016) (citing *Thacker v. Commissioner*, 99 Fed. Appx. 661, 665 (6th Cir. 2004).) Reading the ALJ's decision as a whole, it is apparent that the ALJ reviewed Signature Health 2016 treatment notes, as evidenced in the discussion of other matters. *See, e.g.*, R. 9, tr.,

14

at 20 (citing "B17F," which are "Office Treatment Records, dated 02/08/2016 to 09/26/2016, from Signature Health"); and tr., at 26 (citing B17F and B19F).  The court finds no support for the allegation that the ALJ did not consider treatment records from 2016.

The ALJ found that Martin's statements regarding the severity of symptoms "were partially consistent with the evidence," stating that "there is no evidence that he experienced mood swings and he consistently denied hallucinations."  (R. 9, tr., at 26.)  Martin asserts that the medical records consistently noted anxiety, depression, and additional symptoms, including "mood fluctuations" and "hallucinations."  (R. 10, PageID #: 666.)  He supports this assertion with three dozen citations to the record, without any indication which citations support the contested symptoms of mood swings and hallucinations.  *Id.*  The first citation, for example, is to Halas' June 2012 psychological report (R. 10, PageID #: 666, citing R. 9, tr., at 363), wherein Halas reports that Martin reported crying spells, was depressed, and had high levels of anxiety. No mentions of mood swings or hallucination are found at that page, although the following page reports Martin was "neither hallucinatory nor delusional."  (R. 9, tr., at 364.)  The next citation is to a September 2012 intake form filled out by a nurse, in which Martin reports that he is anxious and depressed.  *Id.* at 369.  The court is not required to wade through uncontested evidence of claimant's anxiety and depression to discover whether there is relevant evidence somewhere in the list which supports claimant's argument concerning mood swings or hallucination.  *See Walters*, 127 F.3d at 529 (plaintiff bears burden of proof at Step Four); *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990); *Kling v. Astrue*, No. 3:12CV143, 2013 WL 785332, at *3 (S.D. Ohio Mar. 1, 2013) (claimant bears ultimate burden of proof on issue of disability, citing *Richardson v. Heckler*, 750 F.2d 506, 509 (6th Cir. 1984)); *see generally Jackson v. Finnegan,*

*Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996) (district court is

under no obligation to sift through the record) (citing cases); *Guarino v. Brookfield Township*

*Trustees*, 980 F.2d 399, 405 (6th Cir. 1992) (party has affirmative duty to direct court's attention

to specific portions of record upon which [she] seeks to rely).

The ALJ's statement that Martin consistently denied hallucinations (R. 9, tr., at 26) is

supported by substantial evidence in the record.  Reviewing the opinion evidence alone, for

example, psychologist Halas assessed that Martin was neither hallucinatory nor delusional.  (R.

9, tr., at 364.)  At his clinical interview with Dr. Konieczny, Martin "denied any history of

auditory or visual hallucinations."  *Id.* at 476.  On Nurse Yip's Mental Medical Source

Statement, where the form asked the provider to identify the patient's signs and symptoms, she

did not indicate that Martin suffered from paranoid thinking, hallucinations or delusions.  *Id.* at

588; *see also id.*, at 534.[3]

Regarding the ALJ's statement that "there is no evidence that he experienced mood

swings" (R. 9, tr., at 26), there is no question that the record shows that Martin's mood was often

characterized as depressed or anxious.  *See, e.g.*, *id.* at 363. Martin, however, contends that the

ALJ failed to discuss his symptoms of mood fluctuations with crying spells.  (R. 10, PageID #:

668.)  He also contends that it is error to characterize his problems with anxiety as "intermittent."

*Id.* at 665.  Martin further alleges that it was error to rely on treatment notes from his primary

---

[3] The claimant emphasizes that Nurse Yip had an "extended treatment relationship" with Martin, and that "Nurse Yip knew [his] medical history and observed him over time sufficient enough" to opine on his condition.  (R. 10, PageID #: 670, 672.)

care physician, rather than a psychiatric specialist, even though he concedes that he was not under the care of a treating psychiatrist at that time. *Id.* at 666.

As mentioned earlier, the ALJ considers any statements that have been provided by medical sources. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Since Martin admittedly was not receiving psychiatric care at that time, it was proper for the ALJ to rely on the medical source who was treating him. As the ALJ noted (R. 9, tr., at 25-26), Martin consistently denied experiencing symptoms of anxiety, depression, difficulties with concentration or memory, hallucination, or insomnia, in visits to Nancy Rodway, M.D., from December 2014 through September 2015. *See, e.g.*, R. 9, tr., at 442, 470, 485, 493, 497, 518. There is no indication that Martin sought (or needed) mental health treatment during this period.[4]

Further, on January 5, 2016, Martin presented at Signature Health for a mental health diagnostic assessment, in part because his physician would not continue psychiatric medications. (R. 9, tr., at 594-596.) At the intake mental status exam, Nurse Yip found that Martin's thought process was linear and organized, and no hallucinations or delusions were observed or reported. *Id.* at 534. The court finds that substantial evidence supports the ALJ's statements that Martin's problems with anxiety were intermittent.

The claimant points to evidence that could support a contrary conclusion to the ALJ's determination. (R. 10, PageID #: 665-668.) The relevant issue, however, is not whether there is evidence to support a ruling different than that reached by the ALJ. *Lebro ex rel. R.L. v. Commissioner*, No. 1:13CV1355, 2014 WL 3749221, at *11 (N.D. Ohio July 29, 2014). The Commissioner's determination must stand if supported by substantial evidence, regardless of

---

[4] Martin's applications allege disability beginning July 5, 2010. R. 9, tr., at 259, 267.

whether some evidence might support another conclusion.  *See Kidd v. Commissioner*, No. 99-6481, 2001 WL 345787, at *3 (6th Cir. Mar. 27, 2001); *Martin ex rel. Martin v. Chater*, 91 F.3d 144, 1996 WL 428403, at *4 (6th Cir. 1996) (TABLE, text in WESTLAW) (per curiam); *Mullen*, 800 F.2d at 545*; Kinsella*, 708 F.2d at 1059.

### 1.   Reviewing Psychologists

Martin next argues that the ALJ improperly assigned great weight to the opinions of the reviewing psychologists[5], Dr. Voyten and Dr. Tishler, because their opinions predate Martin's counseling at Signature Health, which began in January 2016.  (R. 10, PageID #: 668.)  He asserts that the reviewing psychologists' opinions could not be based on the whole record, because they did not have access to records from "the most important treating source" when they rendered their opinions.  *Id.*  Martin also argues that the ALJ erred by finding that the opinions of the reviewing psychologists were consistent with the opinions of the consultative examiners.  *Id.* at 668-669.

State agency doctors are considered highly-qualified experts in disability evaluation, and the ALJ must consider their evidence.  20 C.F.R. §§ 404.1513a(b)(1); 404.1527(e).  An ALJ is required to evaluate all medical opinions, regardless of source, unless an opinion is a treating source's opinion entitled to controlling weight.  *Smith v. Commissioner*, 482 F.3d 873, 875 (6th Cir. 2007) (ALJ must evaluate each medical opinion in the record); *Walton v. Commissioner*, 187 F.3d 639, 1999 WL 506979, at *2 (6th Cir. 1999) (TABLE, text in WESTLAW) (per

---

[5]  Martin repeatedly refers to the reviewing psychologists, Dr. Voyten and Dr. Tishler, as physicians, which is incorrect.  *See generally* R. 10, PageID #: 663, 668. Both are psychologists.

curiam); 20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ must then determine how much weight to give to each opinion.  *Id.*  Although the ALJ generally accords more weight to the opinion of an examining source over a non-examining source, the ALJ is not prohibited from adopting the findings of a non-examining source.  *See generally Gayheart v. Commissioner*, 710 F.3d 365, 375 (6th Cir. 2013); *Ealy v. Commissioner*, 594 F.3d 504, 514 (6th Cir. 2010) (citing *Smith*, 482 F.3d at 875).

The ALJ found that the reviewing psychologists, Dr. Voyten and Dr. Tishler, "agreed that the claimant experienced mild mental health limitations in his activities of daily living and moderate problems with social function and concentration, persistence or pace."  (R. 9, tr., at 27.)  The ALJ stated that their assessments were supported by findings of the consultative examiners, and also consistent with the treatment notes showing intermittent problems with anxiety and social isolation, and thus the ALJ assigned great weight to the opinions of Dr. Voyten and Dr. Tishler.

Regarding the completeness of the record when the reviewing psychologists rendered their opinions, the Sixth Circuit has stated that:

> . . . before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give "some indication" that he "at least considered" that the source did not review the entire record.  *Id.*  In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny.

*Kepke v. Commissioner*, 636 Fed. Appx 625, 632 (6th Cir. 2016) (quoting *Blakley*, 581 F.3d at 409).  The court finds that the ALJ did apply scrutiny to the opinions of Dr. Voyten and Dr. Tishler, by comparing them to other opinion evidence in the record, and finds no error in the ALJ's assessment of those opinions.  Martin also contends "the opinions of the consultative

19

examiners were not consistent with the reviewing [psychologists], as claimed by the ALJ, because the consultative examiners found Plaintiff to have greater limitations."  (R. 10, PageID #: 668-669.)  Martin overstates the ALJ's finding, however.  The ALJ did not explicitly find that the opinions of the reviewing psychologists were consistent with those of the consultative examiners in every regard.  Rather, the ALJ simply stated that the reviewing psychologists' assessments of "mild mental health limitations in his activities of daily living and moderate problems with social function and concentration, persistence or pace . . . were supported by the findings of the consultative examiners who found problems with responding appropriately with others and responding to work stressors."  (R. 9, tr., at 27.)  The court does not find Plaintiff's arguments persuasive.

### 2.  Nurse Yip

Martin also argues that the ALJ provided an insufficient basis for giving Nurse Yip's opinion only partial weight.  (R. 10, PageID #: 669, citing R. 9, tr., at 27.)  The ALJ addressed Nurse Yip's October 2016 Mental Medical Source Statement as follows:

> While this assessment was generally consistent with the claimant's reported symptoms to Nurse Yip during some of his sessions with her, it contradicted the results of mental status examinations that found some minor issues, but generally few signs of abnormality.  Nurse Yip's opinion also directly contradicted the claimant's self-reported symptoms directly before attending sessions at Signature Health.  Furthermore, Nurse Yip is not a licensed psychologist and therefore she is not an acceptable source for opinion evidence.  For these reasons, the undersigned can give her opinion only partial weight.

(R. 9, tr., at 9, internal citations omitted.)

Martin contends that the ALJ erred in finding that Nurse Yip was not an acceptable source for opinion evidence.  (R. 10, PageID #: 671.)  He claims that the regulations, "specifically 20 C.F.R. § 404.1513," explicitly state that a nurse practitioner such as Yip is a

20

"medical source." *Id.*  Martin is incorrect.  Yip is a "Psychiatric Mental Health Nurse Practitioner- Board Certified" (PMHNP-BC), (R. 9, tr., at 592), which was not considered an acceptable medical source at the time of his applications and the ALJ's decision.

Under the regulations that were in effect at the time that Martin's claim was filed and adjudicated,[6] "medical opinions" are defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).  The regulations provided that "acceptable medical sources" are (1) licensed physicians (medical or osteopathic doctors); (2) licensed or certified psychologists; (3) licensed optometrists (for visual disorders only); (4) licensed podiatrists (for foot disorders only); and, (5) qualified speech-language pathologists (for speech or language impairments only).  20 C.F.R. §§ 404.1513(a), 416.913(a); *see also* SSR 06-3p.  According to the regulations in effect when the ALJ rendered the decision, a nurse practitioner was not an "acceptable medical source," but was considered an "other source." *McNamara v. Commissioner*, No. 15-1231, 2015 WL 8479642, at *1 (6th Cir. Dec. 10, 2015) (per curiam) (citing 20 C.F.R. § 416.913(d)(1)); *see also Noto v. Commissioner*, No. 15-1309, 2015 WL 7253050 at *4 (6th Cir. Nov. 16, 2015).

---

[6]  Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017.  82 *Fed. Reg.* 5844-5884 (Jan. 18, 2017).  Plaintiff's claim was filed before March 27, 2017, but the ALJ's decision was rendered before the new regulations took effect.  For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision.

SSR 06-3p discusses the importance of the distinction between "acceptable medical sources" and other health care providers, as follows:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. Second, only "acceptable medical sources" can give us medical opinions. Third, only "acceptable medical sources" can be considered treating sources whose medical opinions may be entitled to controlling weight.

SSR 06-3p, 2006 WL 2329939, at *2 (internal citations omitted). Because a nurse practitioner is not considered an "acceptable medical source" under the pertinent regulations, an ALJ is not required to give any special deference when considering the opinions and statements from a nurse practitioner. *Noto*, 2015 WL 7253050 at *4 (citing *Walters*, 127 F.3d at 530; *Engebrecht v. Commissioner*, 572 Fed.Appx. 392, 397-398 (6th Cir. 2014)); *Cruse v. Commissioner*, 502 F.3d 532, 541 (6th Cir. 2007). The ALJ has discretion to assign the information any weight she determines appropriate based on the evidence of record. *Id.*

Moreover, an ALJ may consider statements from a nurse practitioner when determining the severity of a claimant's impairments and his ability to function. *McNamara*, 2015 WL 8479642, at *1 (citing *Cruse*, 502 F.3d at 541); *Reynolds v. Colvin*, No. 1:12CV2994, 2013 WL 5316578, at *7 (N.D. Ohio Sept. 23, 2013); SSR 06-3p, 2006 WL 2329939, at *2. In evaluating information from an "other source," the ALJ should consider the length of the treating relationship, the consistency of the opinion with other evidence, and how well the source explains the opinion. *McNamara*, 2015 WL 8479642, at *1; *Cruse*, 502 F.3d at 541. The ALJ discussed the consistency and supportability of Yip's statement (R. 9, tr., at 27), and in discussing her source statement, implicitly considered the length of Yip's treatment relationship

with claimant (R. 9, tr., at 587).  Although the ALJ is directed to consider these factors, no exhaustive analysis of them is required.  *See, e.g.*, *Francis v. Commissioner*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. March 16, 2011).  The court finds no error in the ALJ's consideration of Nurse Yip's medical statement.

Martin concedes that the ALJ "provided a seemingly thorough evaluation of the record," but argues that the ALJ only highlighted evidence that did not support his alleged limitations. (R. 10, PageID #: 672.)  This court, however, may not try the case *de novo* or resolve conflicts in the evidence.  *Wright*, 321 F.3d at 614.  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether some evidence might support another conclusion.  *See Kidd*, 2001 WL 345787, at *3; *Martin*, 1996 WL 428403, at *4; *Mullen*, 800 F.2d at 545; *Kinsella*, 708 F.2d at 1059.  The court finds the ALJ's RFC is supported by substantial evidence, and the record evidence as discussed in the ALJ's decision is such that "a reasonable mind might accept [it] as adequate" support for the ALJ's RFC determination.  *See Kirk*, 667 F.2d at 535 (quoting *Richardson*, 402 U.S. at 401).

### B.  Listing 1.04

Martin contends that the ALJ did not conduct a sufficient analysis of Listing 1.04 for spine disorders, at Step Three of the evaluation.  (R. 10, PageID #: 655, 673-675.)

At the third step in the disability evaluation process, a claimant is considered disabled if his "impairment(s) meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement."  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  The Listing of Impairments sets forth those impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or

23

work experience." 20 C.F.R. §§ 404.1525(a).  Therefore, an individual who meets the requirements of a Listed Impairment in conjunction with the durational requirement is deemed conclusively disabled.

Each individual listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3).  It is Plaintiff's burden to "show that his condition meets or equals one of the listed impairments." *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987).  A claimant must satisfy *all* of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (*citing* 20 C.F.R. § 404.1525(c)(3)).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a).

The ALJ should discuss a relevant listing "where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 432 (6th Cir. 2014) (*citing Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).  Although an ALJ errs when no reasons are provided to support a finding that a specific listing was not met where the claimant had put forward sufficient evidence to meet the listing, *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011), such error is subject to harmless error analysis where the claimant "has not shown that his impairments met or medically equaled in severity any listed impairment." *Forrest v. Comm'r of Soc. Sec.*, 591 Fed. App'x 359, 366 (6th Cir. 2014).

24

Plaintiff concedes that the ALJ addressed Listing 1.04, but contends the decision offered no analysis with respect to said listing.  (R. 10, PageID# 673-675).  The relevant Listing's requirements are as follows:[7]

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc diseases, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing § 1.04(A).  The Commissioner's argument asserts Martin did not satisfy the initial element in Paragraph A by showing "evidence of nerve root compression" and, as such, Plaintiff did not meet or equal the Listing.  (R. 11, PageID # 686.)

Although Martin's applications identified only mental conditions that he claimed limited his ability to work ("depression, anxiety, bi-polar, nervous, emotional," R. 9, tr., at 314), the ALJ found that he had the following severe physical impairments: "idiopathic scoliosis, prominent levoscoliosis, [and] degenerative changes of the lumbar and cervical spine with lumbar stenosis." *Id.* at 20.  The ALJ addressed the disputed listing as follows:

> [t]he claimant's degenerative disc disease fails to meet or medically equal Listing 1.04 (Disorders of the spine) of the Appendix 1 impairments.  The record fails to demonstrate a nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight leg raising (1.04A).  *** Accordingly, the undersigned finds that the claimant's degenerative disc disease fails to meet or medically equal listing level severity.

---

[7] Plaintiff asserts error solely with respect to subpart A of Listing 1.04. (R. 10. PageID# 1193).

(R. 9, tr., at 20-21.)  The ALJ's statement on Listing 1.04(A) is brief, but it is sufficient and supported by substantial evidence.

Martin points to evidence in the record that he contends could support a finding of disability through meeting or equaling Listing 1.04.  (R. 10, PageID #: 674-675.)  He relies on a 2014 MRI Lumbar Spine, which showed markedly decreased disc space and disc herniation at L5-S1, central disc herniations at L4-5, and L5-S1 left foraminal stenosis with **probable nerve root impingement**.  *Id.* at 674, citing R. 9, tr., at 420 (emphasis added).  The Commissioner responds that the same MRI report also states, "No evidence for cord compression" and, therefore, Martin did not meet the Listing.  (R. 11, PageID #: 686.)  Martin responds that nerve root impingement is a compression of the nerve.  (R. 10, PageID #: 674 n. 6.)  Indeed, courts have equated compression with impingement.  *See, e.g.*, *Schenning v. Commissioner,* Civ. No. SAG-15-3459, 2016 WL 7408839, at *2 (D. Md. Dec. 22, 2016)* (equating nerve root compression and impingement of a nerve root); *Drotar v. Colvin*, No. 7:13CV265, 2015 WL 965626, at *6 (E.D. N.C. Mar. 4, 2015)* ("The Listings themselves use the terms 'impingement' and 'compression' interchangeably in the context of describing Listing 1.04A"); *Roberts v. Commissioner*, No. 12-14661, 2013 WL 6062018, at *15-*16 (E.D. Mich. Nov. 18, 2013)*; *see also* *Whitehead v. Colvin*, 820 F.3d 776, 781 (5th Cir. 2016)* (referring to "cord impingement" in the context of evidence of nerve root compression).

But even if Martin's contention is correct, that impingement is compression, it overstates the record.  The record merely indicates **probable** nerve root impingement.[8]  *See, e.g., Decker v.*

---

[8]  Martin's brief concedes that there is evidence only "suggesting" a "compromise of a nerve root or the spinal cord."  (R. 10, PageID # 674.)

*Astrue*, No. 11-3115-CV-S, 2011 WL 6000257, at *2 (W.D. Mo. Nov. 30, 2011) (radiologist's finding that extruded disc "probably" involves nerve root is not sufficient to establish compromise of the nerve root as required by Listing 1.04). Moreover, Martin identifies no diagnosis or record demonstrating or equaling actual "nerve root compression." Therefore, the court does not find error in the ALJ's conclusion that the "record fails to demonstrate a nerve root compression…." (R.9, tr., at 20-21.)

Martin, nonetheless, argues there is evidence in the record "suggesting" the other Listing requirements are satisfied. He identifies lower back pain with radiation of pain, paresis, and paresthesia into both legs, with ongoing muscle spasms and tenderness to palpitation of the lumbar spine, as evidence demonstrating neuro-anatomic distribution of pain. (R. 10, PageID # 674-675, citing tr., at 405, 406, 410, 412, 414, 416, 431, 525.) Martin points to evidence of limited range of motion in his spine in all planes, *id.* at 675, citing tr., at 407, 432, 512, as well as motor loss or muscle weakness accompanied by sensory or reflex loss, *id.* at 675, citing tr., at 405, 406. He also refers to evidence of positive straight leg testing, as well as positive findings on Jackson's compression, foraminal compression, and Spurling's and Fabere's tests. *Id.*

The ALJ's Step Four analysis here evaluated relevant medical evidence and it is proper to consider the evaluation of the claimed impairments during other steps of his decision. *Smith-Johnson*, 2014 WL 4400999, at *8. The decision noted that the pertinent 2014 Lumbar MRI and a Cervical MRI on the same date showed reversal of the cervical curve from C4 through C6, disc degeneration at C5-6 and C6-7, encroachment of the anterior thecal sac and central cord secondary to a central disc herniation at C4-5, right sided disc bulging at C5-6 and C6-7, disc degeneration at L5-S1, L4-5 central disc herniation, and L5-S1 left foraminal stenosis and, again,

"probable root impingement."  (R. 9, tr., at 25, citing MER.)  The ALJ found, that despite these imaging results, "neurological examination found no sign of radiculopathy and a physical examination noted no problems with ambulation."  *Id.*  The ALJ also indicated that, while there is evidence that Martin's cervical and lumbar spine show multi-level degeneration, bulges, and scoliosis, more recent physical examinations note few functional limitations.  (R. 9, tr., at 26.)  The claimant testified that he only takes over-the-counter medications for his pain.  *Id.*

The court finds that the ALJ provided sufficient articulation of the decision's findings on Listing 1.04(A).  Even if the ALJ's explanation could have been more thorough, the Sixth Circuit has held that a matter should not be remanded where the plaintiff cannot establish that "a ruling was anything but harmless error," noting the futility of "sending the case back to the ALJ" where it would not "serve any useful purpose …."  *Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'") (*quoting NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (same).  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989); *accord Mabrey v. Comm'r of Soc. Sec.*, 1:13-cv-555, 2015 WL 556435 at *5 (S.D. Ohio Feb. 10, 2015), *adopted by* 2015 WL 1412205 (Mar. 26, 2015).

## VIII.  CONCLUSION

The undersigned recommends that the Commissioner's final decision be affirmed, for the

forgoing reasons.


<u>s/ David A. Ruiz</u>
David A. Ruiz
United States Magistrate Judge


Date:  <u>January 14, 2019</u>

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the
specified time may waive the right to appeal the Magistrate Judge's recommendation.  *See
Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir.
1981).